A06A1963. THE STATE v. DAVIS et al.
A06A1964. DAVIS v. THE STATE.
A06A1965. SMITH v. THE STATE.
(641 SE2d 205)

ANDREWS, Presiding Judge.

Thomas Sinclair Davis and Sylvester Smith were indicted for trafficking in cocaine based on evidence of cocaine seized from Davis's person when police conducted a traffic stop of the vehicle driven by Smith and occupied by Davis as a passenger. These appeals arise from the trial court's pre-trial order granting motions to suppress evidence of the cocaine filed by Davis and Smith asserting that the State violated their Fourth Amendment rights to be free from unreasonable search and seizure. In granting the motions, the trial court found (1) that the police officer had no legal basis to stop the vehicle for a license plate violation, and (2) that even though none of the officer's actions during or after the stop violated the Fourth Amendment, the illegal stop tainted and rendered invalid the officer's seizure of cocaine from Davis's person. In the State's appeal in Case No. A06A1963, we find that the traffic stop was valid and reverse the trial court's ruling to the contrary. In the cross-appeals in Case Nos. A06A1964 and A06A1965, Davis and Smith contend that, even if the traffic stop was valid, the trial court should have suppressed evidence of the cocaine because the officer violated their Fourth Amendment rights after the stop when he illegally seized the cocaine from Davis's person. Because we find no Fourth Amendment violations occurred after the valid stop, we affirm the trial court's ruling that none of the officer's actions taken after the stop was an independent basis for suppression of the cocaine. It follows that the trial court erred by granting the motions to suppress because the cocaine was legally seized after a valid traffic stop.

1. Evidence at the suppression hearing showed that the officer had a valid basis to stop the vehicle driven by Smith because the officer observed that the vehicle's South Carolina license plate was partially obscured by a license plate cover, and that the word "Carolina" was not legible because of a gouge on the plate. OCGA § 40-2-41

provides in relevant part that: "It shall be the duty of the operator of any vehicle to keep the license plate legible at all times. No license plate shall be covered with any material unless the material is colorless and transparent." The officer's observations gave him probable cause to stop the vehicle for violation of OCGA § 40-2-41 because the license plate expiration date was partially covered in violation of the statute, and a portion of the tag was not legible in violation of the statute. *Nelson v. State,* 247 Ga. App. 455 (544 SE2d 189) (2001). The trial court erred by ruling that the above-quoted provisions of the statute did not apply to the out-of-state license plate. Although certain portions of OCGA § 40-2-41 apply only to vehicles registered in Georgia, the above-quoted portions of the statute apply to any vehicle whether registered in Georgia or out of state. *Nelson,* 247 Ga. App. at 456. The trial court also erred by ruling that, even though the word "Carolina" on the license plate was not legible, there was no violation of the statute because the police officer testified he was able to recognize it as a South Carolina license plate. The statute plainly required that the license plate be kept "legible at all times" and it was not legible. OCGA § 40-2-41.

2. The trial court correctly found that nothing the officer did subsequent to stopping the vehicle violated the Fourth Amendment rights of Davis or Smith. The officer's testimony at the suppression hearing and a police videotape of the stop showed that the officer stopped the vehicle Smith was driving because of the license plate violation, checked Smith's driver's license and proof of insurance, explained to Smith why he stopped the vehicle, and then walked with Smith to the rear of the vehicle to show him the problems with the license plate. During this process, the officer became suspicious that there might be contraband in the vehicle when he noticed that Davis and Smith acted nervous and avoided eye contact. The officer informed Smith that he was going to issue him a warning citation for the violation, and then questioned Smith about whether there was contraband in the vehicle as he wrote the warning citation. Smith denied there was any contraband. The officer testified that he completed the warning citation, gave it to Smith, and that despite his suspicions, the traffic stop was concluded at that point and Smith was free to leave. Nevertheless, after giving Smith the warning citation, the officer immediately asked Smith for consent to search the vehicle, and Smith consented to a search of the vehicle. After Smith consented to the search, the officer asked him to remain standing near the front of his patrol vehicle, but when the officer turned to put his warning book back in the patrol vehicle, he observed that Smith walked over to the passenger side of the stopped vehicle and signaled to Davis, who had remained seated in the front passenger seat, to put on his coat. The officer immediately approached the passenger side window,

knocked a couple of times on the window and tried to get Davis to roll down the window, but Davis did not immediately comply. The officer testified that, instead, "[Davis] was putting on his coat real hurriedly like and wouldn't look at me or make any eye contact until he got his jacket all the way zipped up." When Davis finally rolled down the window, the officer told him that Smith had given consent to a search of the vehicle, and he asked Davis to step out of the vehicle. The officer's testimony and the videotape showed that outside the vehicle Davis turned away from the officer and reached into one of his pockets. Based on Davis's movements prior to and after exiting the vehicle, the officer stated that he was concerned Davis might be armed. The officer testified that he asked Davis not to put his hand in his pocket, and then asked for and received consent from Davis for permission to search his pockets. The officer further testified that "when somebody gives me consent to search their pockets like that, I still always pat the outside of the pocket down to make sure I don't feel anything . . . that's going to poke me or stick me. . . ." As shown by the officer's testimony and the videotape, while the officer was patting the outside of the second pocket he received consent to search, he felt a solid brick-shaped object on Davis's person. The officer testified that, based on his training and experience in cases involving the transportation and packaging of illegal drugs — especially cocaine and marijuana — he immediately recognized the object as having the same shape, dimensions, and feel of cocaine or marijuana he had previously found compressed into brick-shaped packages. At that point, the officer seized the object, which he described as an apparent "kilo of cocaine" shaped like a brick and wrapped in tape. The apparent cocaine field tested positive for the presence of cocaine.

In his cross-appeal, Smith contends that, even if the initial traffic stop of his vehicle was valid, he was illegally detained following the stop, and that his consent to a search of the vehicle was not voluntary under the circumstances. The cocaine was not found in a search of Smith's person or Smith's vehicle, but in the officer's search of Davis's person. "Fourth Amendment rights are personal in nature and may be enforced only at the instance of the person whose protection was infringed by the search and seizure." *State v. Jackson*, 243 Ga. App. 330, 331 (533 SE2d 433) (2000). Because we find Smith had no reasonable expectation of privacy in the cocaine found in the search of Davis, Smith lacked standing to challenge the seizure of the evidence. *Robinson v. State*, 226 Ga. App. 406, 408-409 (486 SE2d 667) (1997); *Jackson*, 243 Ga. App. at 331.

In his cross-appeal, Davis similarly contends that, even if the initial traffic stop was valid, the officer's actions subsequent to the stop tainted and rendered invalid the search of his person and seizure of the cocaine. There is no question that, as a passenger in the stopped

vehicle, Davis was seized during the stop within the meaning of the Fourth Amendment, and that he also had standing to challenge the subsequent search of his person conducted after the stop. *State v. Williams*, 264 Ga. App. 199, 201 (590 SE2d 151) (2003); *Jackson*, 243 Ga. App. at 331. Nevertheless, we find no merit to the contention that the officer illegally prolonged the valid traffic stop when, during the course of the stop for a license plate violation, the officer asked questions related to his hunch that there may be illegal drugs in the stopped vehicle. Mere police questioning does not constitute a seizure, and even if police have no basis for suspecting that a person detained at a traffic stop is engaged in criminal activity unrelated to the stop, police may lawfully ask questions during the course of the stop about such unrelated activity, so long as the questioning does not prolong the stop beyond the time reasonably required to complete the purpose of the traffic stop. *Salmeron v. State*, 280 Ga. 735 (632 SE2d 645) (2006). Here, we find no basis for concluding that the officer's questioning during the stop prolonged the stop beyond the time reasonably required for the purpose of the stop. Even though the officer asked for consent to search the vehicle immediately upon concluding the traffic stop, we have "decline[d] to accept [the] argument that a request for consent to search, in and of itself, constitutes a continued detention and questioning." *Anderson v. State*, 265 Ga. App. 146, 150-151 (592 SE2d 910) (2004). The record supports the trial court's ruling that the State proved Smith voluntarily consented to a search of his vehicle. *Schneckloth v. Bustamonte*, 412 U. S. 218, 228-230 (93 SC 2041, 36 LE2d 854) (1973). At that point, the officer had a valid reason to ask Davis to get out of the vehicle so that he could search the vehicle. Even though the record shows that several police officers were present at the stop, there is no evidence that police took any action at the stop to expressly or impliedly coerce Smith's consent. Id. Because of the suspicious actions taken by Davis before and after he exited the vehicle, the officer became concerned that Davis might be armed, so for safety reasons the officer asked Davis for consent to search his pockets. We need not consider Davis's contention that the officer lacked a reasonable belief that he was armed and dangerous, and therefore the pat-down for weapons conducted by the officer violated the Fourth Amendment. See *Terry v. Ohio*, 392 U. S. 1, 26 (88 SC 1868, 20 LE2d 889) (1968); *Minnesota v. Dickerson*, 508 U. S. 366, 373-376 (113 SC 2130, 124 LE2d 334) (1993). The record shows that Davis voluntarily consented to the search of the pocket during which the officer felt and seized the cocaine, so the State was not required to show that the officer reasonably believed Davis was armed, or that he had a basis to believe that the object he felt was a weapon or was recognizable contraband under the "plain feel" doctrine. Id. Finally, the record supports the trial court's conclusion that

the State carried its burden to prove that Smith's consent to the search was voluntary under the totality of the circumstances. *Schneckloth*, 412 U. S. at 228-230. There is no evidence that police took any action that subjected Davis to duress or coercion, and the mere presence of multiple police officers at the stop was not evidence of coercion. See *Smith v. State*, 263 Ga. App. 707, 709 (589 SE2d 252) (2003).

*Judgment reversed in Case No. A06A1963. Judgments affirmed in Case Nos. A06A1964 and A06A1965. Barnes, C. J., and Bernes, J., concur.*

DECIDED JANUARY 5, 2007 — ■■■■■■

*Timothy G. Madison, District Attorney, Robin R. Riggs, Assistant District Attorney*, for the State.
*McDonald & Cody, Douglas W. McDonald, Jr.*, for Davis.
*Healy & Svoren, Timothy P. Healy, Nina M. Svoren*, for Smith.